```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
THOMAS J. HUMPHRIES, M.D.             :
                                      :
                                      :
                     Plaintiff        :    04 CIV 9185 (AKH)
                                      :
FERRING PHARMACEUTICALS,              :
Plaintiff's Employer and its wholly   :
owned subsidiary, FERRING             :    AMENDED COMPLAINT
PHARMACEUTICAL, INC., as and for      :    AND DEMAND FOR A
itself, as well as the alter ego      :    TRIAL BY JURY
agent of its Parent in personnel      :
procedures, income payments and       :
monitoring of Plaintiff,              :
                                      :
                     Defendants       :
_____:
```

Plaintiff, THOMAS J. HUMPHRIES, M.D., by his attorneys, Sonageri & Fallon, LLC, as and for his complaint against the defendants herein, respectfully alleges and states as follows:

## **Parties**

1. Plaintiff Thomas J. Humphries, M.D., resides with his family at 353 South Maple Avenue, Ridgewood, New Jersey, 07450.

2. Defendant Ferring Pharmaceuticals is a privately held Danish company with its principal office at A/S Kay Fishers Plads 11 2300, Copenhagen, Denmark.

3. Ferring Pharmaceuticals, Inc., is the wholly owned subsidiary, alter ego and agent of its Danish parent, Ferring Pharmaceutical. It maintains its principal office at 400 Rella Boulevard, Suite 300, Suffern, New York, 10981 ("Suffern").

**Jurisdiction**

4. Inter alia, this is an action brought pursuant to the Age Discrimination in Employment Act ("ADEA") and Title VII of the Civil Rights Act for wrongful, discriminatory termination of Plaintiff Thomas J. Humphries, and for harassment of, by and at Suffern, including but not limited to violation of defendant Ferring's employee policies and procedures.

5. This action is filed in the Southern District pursuant to EEOC Notice of Suit Rights mailed to Plaintiff on August 23, 2004. Further, jurisdiction is sought under the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution.

6. Jurisdiction is also premised upon diversity of citizenship pursuant to 28 U.S.C. § 1332, AND the matter in controversy exceeds, exclusive of interest and costs, the sum of Seventy-Five Thousand Dollars ($75,000.00), for jurisdiction of breach of the agreement SET FORTH in the February 25, 2004 countersigned writing of Senior V.P. O'Connor, which states it is a "warning" to be cured/eliminated by plaintiff agreeing to accept the offer and provide the consideration of entering into the Unum Provident Anger Management Program under the Ferring Employee Assistance Program which Dr. O'Connor directed be supervised by Suffern President Anderson.  Anderson acted willfully because he deliberately directed the manufacture of yet another confrontation to "derail" Plaintiff's progress rather than let the curative anger management

program of Unum Provident be completed and the psychologist report as requested by the February Agreement. This deliberate destruction of the agreed-upon Unum Anger Management Program before Plaintiff's completion violates minimal personnel administrative procedure, common sense, and would not have been even attempted without knowledge and permission of Suffern's "big brother" in Denmark. Plaintiff actually successfully completed the Unum program, attending his last scheduled session on Tuesday, May 11, 2004, after his willful, deliberately wrongful termination on Monday, May 10, 2004.

## AS AND FOR A FIRST CAUSE OF ACTION
## AGE DISCRIMINATION

7. Plaintiff, at age fifty-nine, began employment with defendant Ferring Pharmaceuticals at the start of May, 2003, as Vice President, Global Clinical Research and Development responsible for the Americas.

8. Plaintiff was found and recommended to Ferring Pharmaceuticals by an international pharmaceutical executive search firm for his successful record, honed by his age and experience, of shepherding drugs through the FDA, not just his primary task, but rather his *sine qua non* task. He was then recruited by Dr. Patrick O'Connor, Senior Vice President of Global Clinical Research and Development, who faxed Plaintiff a letter on April 14, 2003, which confirmed, among other things, "starting salary will be $250,000

per annum, ... participate in a bonus program for up to 20% of base salary", as well as "... Relocation Assistance will be provided ...", along with the Suffern benefits program. The agreement also contained an "employment at will" provision which, as with the same New York "law", is supervened when the employer engages in illegal age discrimination in its wrongful termination. Thus, Plaintiff was found to be "qualified" for the position, having the education, age and experience of his 20-year track record of getting drugs approved by the FDA to aid patients around the world.

9. Plaintiff performed his assigned task well enough for Senior V.P. O'Connor to do his annual performance review in November, 2003, rather than April, 2004. At that review meeting, Dr. O'Connor awarded Plaintiff the maximum performance bonus for 2003 of 20% of base salary since May, 2003 ($33,333.33), and raised in annual salary to $265,000.00 as of January 1, 2004.

10. At that meeting, as well as before and after, Dr. O'Connor told Plaintiff that Suffern executives, who attended Plaintiff's in-house program of instruction in Suffern, objected and were insulted by his citing to "in my 20 years of experience dealing with the FDA", or "over the years, one learns this is the way it should be done." Plaintiff was told that Suffern executives, *i.e.*, Messrs. Anderson and Kashkin, resented his age and experience, competence and success so much that they requested that Dr. O'Connor somehow punish him for speaking of his age and experience.

Dr. O'Connor declined. However, he did inform plaintiff of Suffern's objections to his citing age and experience, and, where possible, Plaintiff changed his talks.

11. Unfortunately, Suffern executives did not agree with Dr. O'Connor declining their demand, so they went over his head to their man in Denmark, the Chairman, and got clearance to launch a program of Suffern age discrimination and harassment, not by President Anderson or Vice President Kashkin but primarily through their direction of the next lower layer of Suffern managers, such as the Chief Financial Officer ("CFO") McMorrow, Ms. Knarich, the Suffern Head of Personnel, or Ms. Denise, President Anderson's executive assistant.

12. As for example, Plaintiff needed a flat screen for his computer to send and receive messages from Denmark, including among other things, to match the flat screens at Copenhagen Research and Development, and, more importantly, to be more readily readable by his 59-year-old eyes, even with glasses. The C.F.O., operating on instructions from above, refused to authorize the purchase of a $500 flat screen for this $300,000 a year executive, suggesting that he get younger eyes. He was most dismayed when Plaintiff made the purchase directly, but the C.F.O. eventually relented because it was actually money from Denmark, not Suffern, that paid for the equipment for Plaintiff.

13. However, the C.F.O. continued making life difficult for Plaintiff by not timely paying for Plaintiff's cellphone bill,

which was his primary link with Copenhagen due to the six hour time difference with Europe work days.  In addition, although aware that Plaintiff's travel expenses to and from his home in Massachusetts and his motel bills in New Jersey were clearly payable pursuant to the relocation portion of his April 14, 2003 letter agreement with Dr. O'Connor, the C.F.O. did not make reimbursement on Plaintiff's expense account(s) on a timely basis so that Plaintiff had to pay his relocation credit card bills before he received reimbursement from the C.F.O.  The C.F.O.'s only comment to plaintiff was that he was too old to do all this traveling and to be away from home.

    14. The Head of Human Resources told Plaintiff, immediately upon their meeting, that she had a J.D. Law Degree.  It was only later, after a confrontation with her about Plaintiff's rewrite of the position descriptions for the persons he wanted to recruit for his team to initiate and facilitate Ferring Pharmaceutical's new prescription drugs' journey through the FDA.  She thought his team position descriptions were the old fashioned approach of a grumpy old man.  She stated that this old approach is probably what generated President Anderson's instructions that she was to fulfill any and all of the needs or requests of his and those of Vice President Kashkin before doing any human resources things for the old man Plaintiff.

    15. In addition, the Head of Personnel Knarich became the creator and conduit, telling tales to Denmark of confrontation(s) with Plaintiff (which Plaintiff believes were staged to injure the

grumpy old man), who was never informed or asked for "his side" of these manufactured confrontations except for one. That one confrontation committed by members of Ms. Knarich's staff. What happened was that Plaintiff found Ms. Knarich's assistants had invaded one of his staff offices in his wing, piled all the papers from the desks willy-nilly in the corner because personnel wanted to use it. Ms. Knarich's staff had forgotten to arrange for a room to conduct interview appointments and, most importantly, personnel decided it was not necessary to inform or seek clearance for using the office of one of Plaintiff's team at all but especially as a surprise without permission.

16. This particular confrontation was brought up by Ms. Knarich at a meeting attended by both Dr. O'Connor and Plaintiff. When Dr. O'Connor heard the actual "facts of the confrontation", he said he believed that Ms. Knarich was wrong; he would have "none of it", and suggested that she should apologize to Plaintiff for the way her people behaved.

17. The Head of Personnel never apologized and, more importantly, continued her, directed from above, approach that she would neither tell Plaintiff of the string of manufactured confrontations she created nor ask for "his side of the confrontation". Plaintiff was convicted in absentia without a hearing but with communication to the Danish allies of Mr. Anderson by Ms. Knarich.

18. Lastly, both President Anderson and Ms. Knarich wilfully

and deliberately prevented the Plaintiff's completion of Unum Provident's Anger Management Program. As set forth in the O'Connor writing of February, 2004, President Anderson was to monitor Plaintiff's participation in the program through completion. Completion was contractually required to overcome Dr. O'Connor's "warning" of possible termination stated in the countersigned February, 2004 memorandum agreement. Since the Anger Management Program schedule was set up by Anderson and Knarich, and President Anderson was specifically charged to supervise and monitor plaintiff, he knew when the schedule would be completed.

19. In addition to the Plaintiff's excellent performance review in November, 2003, the Copenhagen Clinical Research and Development headquarters filed the necessary documents with the FDA to appoint Plaintiff their sole spokesman, representative and contact with the FDA. Thus, Plaintiff's performance received the highest of praise – the appointment to the FDA, which was not offered to Suffern staff or Suffern officers by Clinical Research and Development of Denmark.

20. Plaintiff's successful performance of the work of his position for Denmark and its Clinical Research and Development executives was beyond cavil when he was sandbagged by their willful, manufactured, wrongful negative personnel happening. His surprise termination of May 10, 2004, by Senior V.P. O'Connor, who had received the surprise order to spend the May 8/9 weekend to fly to the United States to suddenly terminate the Clinical Research

and Development prize performer without Plaintiff being aware, without a hearing, without completion of the Unum Provident program, and without being told whatever was the cause of the termination. The notice of termination states only "Ferring Pharmaceuticals, Inc. terminates your employment effective immediately", and it is signed by Dr. O'Connor. To the best of Plaintiff's knowledge, the defendants do not plan to search for or hire a younger replacement until this litigation is resolved.

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Since so much vitriol has been generated, instead of reinstatement Plaintiff be awarded liquidated damages of double back pay, benefits, bonuses, and pension/401k contributions for the willful actions of the management of Ferring in creating confrontations and, more importantly, deliberately and wrongfully disregarding the final Anger Management session of Plaintiff's February 2004 contract for Unum Provident's Anger Management Program, although, since they had arranged it and had set the meeting schedule. President Anderson was to monitor it, so he and Ms. Knarich clearly knew Plaintiff had not completed the program.

b. Award Plaintiff front pay of salary, benefits, performance bonuses and pension/401k through age 70 since Plaintiff, not a policy maker, could not be forced to leave at age 65.

c. Award plaintiff the costs of this action, together with reasonable attorney's fees, as provided by 29 U.S.C. § 626(b), and, by incorporation, 29 U.S.C. § 216(b).

d. Grant plaintiff such additional equitable and legal relief as the Court deems just and proper in the circumstances.

## AS AND FOR A SECOND CAUSE OF ACTION
## BREACH OF CONTRACT

21. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 12 of the Complaint as if each were more fully set forth herein.

22. On February 25, 2004, defendant Ferring Pharmaceuticals, through Dr. O'Connor, sent Plaintiff a memorandum stating he had been told by Suffern that Plaintiff was unable to control his feelings of anger.  The memorandum advised Plaintiff that assistance should/would be sought under the Employee Assistance Program of Ferring Pharmaceuticals for anger management counseling, and that Plaintiff was eligible for three sessions with a psychological counselor.  Dr. O'Connor advised Plaintiff that he was being offered participation in the sessions, which were provided by the Ferring Pharmaceuticals Work-Life Balance Program through Unum Provident Insurance Company.  The letter warned Plaintiff that if he did not participate and correct his behavior, "additional disciplinary action up to and including termination of employment" would result.  Suffern President, Wayne Anderson, was appointed by Dr. O'Connor to monitor Plaintiff's participation in the program.

23. Plaintiff accepted this offer and provided consideration

by attending the counseling sessions.  He successfully completed the Program, attending his last session after he was wrongfully, discriminatorily terminated.

24. While Plaintiff had not missed a session and still had more to go to completion, nevertheless, on May 10, 2004, Plaintiff was terminated from his employment with Ferring Pharmaceuticals at a meeting with Ms. Knarich and Dr. O'Connor, who had flown in from Denmark to attend the termination.  The termination was effective immediately.  No reason was given for the termination, and no comments were made or sought from the Unum Provident psychologist whose sessions made up the program.

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Award the Plaintiff actual damages for loss of salary, performance bonuses, benefits and pension/401k, including back pay at least through December 31, 2004, of $141,000 ($265,000 less $124,000 paid through May 10, 2000), plus his 20% performance bonus of $53,000 and cost of benefits such as insurance and maximum 401k contributions to pension.

b. Grant plaintiff such additional equitable and legal relief as the Court deems just and proper in the circumstances.

## AS AND FOR A THIRD CAUSE OF ACTION
### HOSTILE WORK ENVIRONMENT

25. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 24 of the Complaint as if each were more fully set forth herein.

26. In addition to the incidents set forth above with respect to the wrongful termination of plaintiff on May 10, 2004, Plaintiff was surprised to see Dr. O'Connor going down the hall to President Anderson's office that morning, since Dr. O'Connor normally called him when he was coming to the United States.  Plaintiff was so surprised that he asked President Anderson's Executive Assistant, Ms. Denise, "Was that Dr. O'Connor I saw going down the hall, and why has he come?"  Ms. Denise, who could not resist a gloating smile, responded, "Yes, it was Dr. O'Connor and you will shortly find out why he is here!"  Plaintiff thought something smelled on Thursday, May 6th, when he discovered some of Dr. Kashkin's people had borrowed the new furniture from the office of his staff. However, since he had learned at his Anger Management program, he did not escalate but rather asked them to return it in conversational tones, which they did.

27. Plaintiff had not given Ms. Knarich or President Anderson the shouting match confrontation they sought, but this apparently did not prevent them from claiming a forest fire (although Plaintiff was not asked to comment or present witnesses to his conversational tones and the easy resolution of returning the furniture.)  So Ms. Denise had spent Friday, May 7th, overcoming the six hour time difference communicating with and arranging Danish communications for President Anderson and Ms. Knarich to report the incident and get the head of the Ferring hierarchy to order Senior Vice President of Global Clinical Research and Development to drop

everything to immediately fly to Suffern to terminate Plaintiff before completion of the Unum Provident program, which Dr. O'Connor and Plaintiff had agreed to in February, 2004.

28. This manufactured confrontation leading to the termination of May 10, 2004 was not the first time that Suffern had claimed a forest fire confrontation to trigger the termination of an over the age of 40 United States representative of Ferring's Copenhagen Clinical Research and Development group.  On information and belief, President Anderson, Vice President Kashkin and their next lower layer of management minions had, in the fall of 2002, wrongfully terminated Dr. Ronald V. Nardi, falsely claiming he caused or initiated similar confrontational forest fires.

29. Suffern had, for whatever reason, continued to employ Dr. Nardi's Administrative Assistant after his wrongful termination so that she was assigned to Plaintiff upon his arrival in May, 2003. She appeared to have been sufficiently brainwashed by Suffern that she regaled Plaintiff with tales of tons of terrible DR. Nardi confrontations with Suffern executive, management, and employees. Suffern did not know that years ago, Plaintiff had worked closely with Dr. Nardi on applications to the FDA for clearance of new drugs.  Plaintiff recalled Dr. Nardi to be about four years younger than he, and a talented, knowledgeable person with an accommodating approach to work rather than being confrontational with subordinates or anyone else.

30. One can only conclude that the 2003 and 2004 harassing of

the United States representative of Copenhagen Clinical Research and Development was repeating a rehearsed course of conduct of harassment and confrontation to force Plaintiff to quit rather than continue to be wrongfully harassed because of his protected age status, as well as overcome obstacles from the purchase of furniture and equipment, deliberate delayed reimbursement of expense accounts, failure to timely pay cellphone bills, which, because of the limited work day time window with Europe, is a most important tool for communicating with Denmark and, last but not least, overcoming Ms. Knarich's refusal to utilize Plaintiff's position description for the FDA approval team because she knows better than he (how she never stated) about FDA clearance.

31. However, as bad as the above described actions are, as well as the emotional distress they inflicted on Plaintiff, they are trumped by the deliberate, willful actions in derailing the Unum Provident program and rushing to report the bogus confrontation which did **not** occur on Thursday, May 6, 2004.  An employer making an agreement with an employee to complete a program to cure or to overcome conduct that could lead to termination, but then not permit the employee to complete the program and be evaluated, adds to the hostile work environment.  It is as if the employer gratuitously moved the goal posts back in the fourth quarter so that the employee can never win.

32. While the above shows the harassment was inflicted against Plaintiff's protected age status, the fact is that Suffern did the

same thing to Dr. Nardi, Plaintiff's predecessor in 2002. Dr. Nardi was the FDA clearance person employed by the Ferring Clinical Research and Development group in Copenhagen, and on information and belief, he maintained an office and apartment in Copenhagen as well as in Suffern. Suffern's dealing with Dr. Nardi in 2002, along with avoiding any mention of protected age status, may be what caused the terse anomaly which appears in Dr. O'Connor's one page, one line termination notice of May 10, 2004 on Ferring Pharmaceuticals letterhead stating: "Ferring Pharmaceuticals, Inc., terminates your employment immediately", then his signature. Dr. O'Connor may have based his writing on Plaintiff's paychecks, relocation checks, expense reimbursement checks, and his W-2, right down to taxable salary reduction by Plaintiff's contributions to his 401k, which are all documents bearing the brand of only Ferring Pharmaceuticals, Inc. (Dr. O'Connor has told Plaintiff he is paid direct deposit in the United States, as apparently Dr. Nardi was as well).

WHEREFORE, for all the pre-planned and previously executed actions of Suffern in harassing the holder of the FDA position of Copenhagen headquarters of Ferring Clinical Research and Development resulting in continuing infliction of emotional distress while employed at Suffern and for the emotional distress of being put out of work at age 60 and still searching for a comparable position while expenses continue with no income, Plaintiff respectfully requests this Court

a. Declare that Plaintiff has suffered a hostile work environment at and by Suffern in an encore performance of their deliberate and knowing false actions that culminated in the 2002 wrongful termination of Dr. Nardi once again being inflicted on Plaintiff.

b. Award damages to Plaintiff that the Court deems correct for deliberate fraudulent infliction of a hostile work environment that is a repeat performance of what was done to Dr. Nardi.

c. Grant Plaintiff such additional equitable and legal relief as the Court deems just and proper in the circumstances.

Dated:   Hackensack, New Jersey
         April 27, 2005

                              SONAGERI & FALLON, L.L.C.
                              Attorneys for Plaintiff


                         By: s/Gerard C. Fallon
                              GERARD C. FALLON (GCF 9102)
                              411 Hackensack Avenue
                              Hackensack, New Jersey 07601
                              (201) 646-1000